NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____
                                   :

| | | |
|---|---|---|
| MAG REALTY, LLC and MAG ENTERTAINMENT, LLC d/b/a CHEERLEADERS TOO, | : : : : | |
|        Plaintiffs, | : : | Civil No. 10-988 (RBK/AMD) |
|        v. | : : | **OPINION** |
| CITY OF GLOUCESTER CITY, GLOUCESTER CITY PLANNING / ZONING BOARD, and JOSEPH STECKLAIR, in his capacity as Chief Housing Inspector and Zoning Official, | : : : : : : | |
|        Defendants. | : : | |

_____ :

**KUGLER**, United States District Judge:

Plaintiffs MAG Realty, LLC and MAG Entertainment, LLC (collectively, "Plaintiffs") are

New Jersey limited liability companies that own the real estate at 54 Crescent Boulevard,

Gloucester City, New Jersey (the "Property") and operate there an adult oriented business, known

as Cheerleaders II ("Cheerleaders") where customers may go to enjoy food, alcoholic beverages,

and scantily clad female dancers.  For more than thirty years, a business has operated on the

Property.  In 1997, Defendant Gloucester City adopted the Gloucester City Development

Ordinance (the "Development Ordinance"), which assigned the Property to the Highway

Commercial District, which does not permit Plaintiffs' use.  The businesses at the Property

continued to operate, however, presumably as a lawful pre-existing, non-conforming use.

1

In February of 2010, after years of negotiations with the New Jersey Alcoholic Beverages Commission ("ABC"), Cheerleaders voluntarily surrendered its liquor license. In anticipation of that event, Plaintiffs sought clarification from Gloucester City that the loss of the liquor license would not affect their right to continue their business as a pre-existing, non-conforming use. At a hearing before the Gloucester City Planning / Zoning Board (the "Board") held on January 20, 2010, Plaintiffs presented evidence of thirty years of use of the Property as a tavern, restaurant, and go-go entertainment establishment. Plaintiffs also presented evidence that the only change to this use going forward would be that Cheerleaders would transition to a "BYOB." In other words, it would cease selling alcoholic beverages and instead allow customers to bring their own wine and beer, which would be served to them by Cheerleaders' employees. On February 17, 2010, the Board denied Plaintiffs' application on the grounds that their use was new, resulting in a loss of the protections afforded by pre-existing, non-conforming use status.

On February 25, 2010, Plaintiffs filed a Complaint against Defendants Gloucester City, the Board, and Chief Housing Inspector and Zoning Official Joseph Stecklair (collectively, "Defendants") pursuant to 42 U.S.C. § 1983. The Complaint sounds in seven counts, essentially alleging that (1) the Board's decision (subsequently memorialized in Resolution R-05-2010 adopted on March 16, 2010) is invalid under state law; and (2) Chapter 12 and § 15-6(c) of the Gloucester City Code as well as Article III, § 3 and Note 18 of the Development Ordinance, and to the extent applicable, N.J. Stat. Ann. § 2C:34-7, violate the First and Fourteenth Amendments because these laws, inter alia, effectuate a veritable zone-out of Plaintiffs' constitutionally protected dancing and are otherwise overly vague. Plaintiffs requested equitable and declaratory relief. On the same day, Plaintiffs moved for a temporary restraining order and a preliminary

2

injunction.  On March 1, 2010, the Court held a hearing and granted Plaintiffs' application for a temporary restraining order, restraining Defendants from enforcing the zoning laws against Plaintiffs until further order of the Court.  At that time, the Court also scheduled a hearing on the proposed final injunction.  Plaintiffs filed an Amended Complaint on March 23, 2010, which Defendants answered on April 12, 2010.

On June 29, 2010, the trial on the proposed final injunction began.  The Court received evidence, and at the close of the day's proceedings, postponed the trial until July 6, 2010, at which time the trial was resumed.  Both sides having rested, the Court ordered written closing arguments, in the form of supplemental briefs, to be submitted by July 13, 2010.  On July 12, 2010, counsel for Defendants submitted a letter to the Court informing it that the governing body of Gloucester City had adopted on final reading Ordinance 013-2010, amending prior Ordinances 017-2004 and 016-2006, with the effect of removing any residential use as a permitted use in the Southport Redevelopment Area of the City.  The letter proceeded to argue that the Court should consider only Ordinance 013-2010 in its First Amendment analysis, which argument the Plaintiffs opposed the following day also by way of letter.  On July 13, 2010, both parties submitted written closing arguments.  On July 14, Plaintiffs submitted a letter responding to Defendants' argument, raised in their trial brief, that the Court was prevented from ruling on the constitutionality of the New Jersey statute because neither Plaintiffs nor the Court had comported with the notice requirements of Federal Rule of Civil Procedure 5.1, to which Defendants responded, also by letter, on the same day.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby makes the following findings of fact and conclusions of law.

I.      **FINDINGS OF FACT**

      A.      **The Challenged Municipal Laws**

1.      Chapter 12 of the Gloucester City Code regulates "adult uses."  Gloucester City, N.J.,

Code Ch. 12 (1998).  Amongst other things, it prohibits an "adult establishment" from locating

within 1,000 feet of a residential zone, school, hospital, clinic, institution, library, playground,

park, recreational facility, church, convent, monastery, synagogue, similar place of worship, bar,

tavern, or other facility licensed for the consumption or sale of alcoholic beverages, and any other

adult store or adult establishment.  Id. at § 12-4.  In pertinent part, it defines an "adult

establishment" as "[a]ny establishment which has a substantial or significant portion of its . . .

business activities restricted to adults and which excludes minors by virtue of age."  Id. at § 12-3.

Excluded from this definition are "establishments licensed for the sale or consumption of

alcoholic beverages."  Id.

2.      Article III, § 3 of the Development Ordinance defines, inter alia, the terms "gentlemen's

club" and "go-go bar."  Both are defined as:

> A licensed premises for the sale and consumption of alcoholic beverages wherein
> adult entertainment is provided by the licensee such as erotic dances performed by
> men or women, employed by the licensee with or without pay.

Gloucester City, N.J., Development Ordinance, Art. III, § 3, at G-3.1, G-3.2 (1997).  Neither a

gentlemen's club nor a go-go bar is considered a "sexually oriented business" for purposes of

Note 18 of the Development Code.  Id.

3.      Note 18 of the Development Ordinance regulates "sexually oriented businesses."

Amongst other things, Note 18 prohibits sexually oriented businesses from locating within 1,000

feet of a place of worship, a school, a playground, a place of public resort and recreation, an area

zoned for residential use, an existing sexually oriented business, a residential use, and a premises

licensed for the sale of alcoholic beverages.  A sexually oriented business is defined, in pertinent

part, as:

> A commercial establishment which regularly features live performances
> characterized by the exposure of a "specified anatomical area"[1] or by a "specified
> sexual activity"[2] or which regularly shows films, motion pictures, video cassettes,
> slides, or other photographic representations which depict or describe a "specified
> sexual activity" or ["]specified anatomical area."

Id. at Art. V., Note 18(2)(k)2.  An "adult cabaret" and an "adult theater" are examples of sexually

oriented businesses.  Id. (flush language).

4.      Gloucester City Code § 15-6(C) provides for restrictions on the issuance of retail

consumption licenses to premises offering adult entertainment.  The issuance of plenary retail

consumption licenses is prohibited where issuance would permit the sale of alcoholic beverages

on a premises that offers adult entertainment and is located in a residential area or within 200 feet

of a residential area, a residence, a school, a church, a park, or playground.  Gloucester City, N.J.,

Code § 15(C)(1).  For purposes of this ordinance, "adult entertainment" is defined as erotic

dancing conducted at premises licensed for the sale of alcoholic beverages.  Id.

**B.      Proceedings Before the Board**

5.      Plaintiff applied to the Board for an interpretation of its ordinances, ultimately seeking a

---

[1]  Specified anatomical areas are defined as "[l]ess than completely and opaquely covered
human genitals, pubic region, buttocks or female breasts below the point immediately above the
top of areola" or "[h]uman male genitals in a discernable turgid state, even if completely and
opaquely covered."  Gloucester City, N.J. Development Ordinance, Art. V., Note 18(2)(l).

[2]  Specified sexual activities include the "[f]ondling or other erotic touching of human
genitals, pubic region, buttocks or female breasts" as well as "[a]ny actual or simulated act of
human masturbation, sexual intercourse or deviate sexual intercourse."  Id. at Note 18(2)(m).

determination that the Property was a pre-existing, non-conforming go-go dance club use together

with a restaurant and tavern and that Plaintiffs could therefore continue to use the Property as such

despite a lack of a valid liquor licence.  The Board held a hearing on January 20, 2010 and a

second hearing on February 17, 2010, at which time the Board voted to deny the application.

6.      Plaintiff submitted evidence to the Board of the following deed transfers: Dolan to Dolan

Clubs, Inc. To Erloo, Inc. to 130 Tavern, Inc. to Gloucester House, Inc. (operating as Red Oak Ale

House) to Bekas to John Kozmal and Victor Finizio (trading as V&J Company) to Maeulvic, Inc.,

(operating first as the Dollhouse and then as the Harem) to MAG Realty (operating as

Cheerleaders, II).

7.      Plaintiffs offered evidence to the Board with respect to the uses to which the Property was

put over the years.  According to that evidence, the Property was purchased from 130 Tavern, Inc.

by the Gloucester House in 1976 and began operating as the Red Oak Tavern.  The Red Oak

Tavern served food, alcoholic beverages and featured live go-go dancing entertainment.  The

available food was bar-type food, such as hot sandwiches, hamburgers, cheese steaks, etc.  A sit-

down type dinner was not available.  Female dancers would dance on stage in small bikinis.

Normally, two females would be dancing at a time.  On a given day, roughly six or eight females

worked as dancers at the club, although that number might have been higher on weekends.  After

dancing, the females would mingle with the patrons, potentially receiving tips.  The hours were

roughly mid-day to two o'clock in the morning.

8.      Plaintiffs offered evidence to the Board that a zoning ordinance was passed in Gloucester

City in 1982.  Plaintiffs further offered evidence that the City cannot produce the zoning map

associated with that ordinance.  Plaintiffs assume that they were located in a commercial zone,

6

which apparently authorized retail and commercial uses similar to restaurants.  The businesses operating at the Property were allowed to operate by the City.

9.      Plaintiffs offered evidence to the Board that the Property began operating as the Dollhouse in 1987.  According to Plaintiffs' evidence, the Dollhouse served food, alcoholic beverages, and featured live go-go dancing entertainment.  The Dollhouse eventually changed its name to the Harem.  The Harem continued to serve food, alcoholic beverages, and feature live go-go dancing entertainment.  The food included meatball sandwiches, roast beef, hot roast pork, sausage, a lunch buffet, bar food, and chicken fingers.  The dancers wore basically the same costumes.  One or two females danced at a time.  After dancing, the females would mingle with the audience, potentially receiving tips.

10.     Plaintiffs offered evidence to the Board that, in the early nineties, the business began to change because the entertainers became independent contractors.  According to Plaintiffs' evidence, this meant that the Dollhouse could afford to put more females on stage on a given day.  This meant that early in the week, anywhere from fifteen to eighteen females danced and that on the weekends between fifteen and twenty-five females danced.

11.     In 1997, the current Development Ordinance was adopted.  The Property is currently zoned Highway Commercial.  This zoning permits a variety of retail and service uses such as  – but certainly not limited to – auto and boat sales, recreation facilities, nurseries, tattoo parlors, and veterinaries.  Gloucester City, N.J., Development Ordinance Art. IV, Schedule of District Regulations.  It does not list taverns, bars, or sexually oriented businesses as permitted uses.  It does list "Restaurant, Fast Food" as permitted.  Id.  The parties agree that Plaintiffs do not conform to the present zoning requirements.

12.     Plaintiffs offered evidence that the Property was sold to Plaintiffs in 1999 and began

operating as Cheerleaders II.  According to Plaintiffs' evidence, Cheerleaders II served food,

alcoholic beverages, and featured live go-go dancing entertainment in basically the same manner

as it had prior to the enactment of the Development Ordinance.

13.     The Chairman of the Board, Mr. Wunsch, testified that he had patronized the Property in

the late seventies and early eighties as a young boy of twelve or fourteen with his father who

would take him there to shoot pool on some Saturday afternoons.  Chairman Wunsch testified that

he also patronized the establishment after work on Friday nights as a young man of legal drinking

age.  He testified that the go-go dancing did not occur at all times.  He did not remember specific

times, but he testified that the go-go dancing would cease around six or seven o'clock in the

evening and a disc-jockey would begin entertaining.

14.     Plaintiffs offered the testimony of Mr. Meehan, a co-principal and manager of a

Cheerleaders location in Philadelphia.  Amongst other things, Mr. Meehan testified that in 2005

Cheerleaders, II stopped serving food because the kitchen became too costly to maintain.

According to Mr. Meehan, food was still served for special events such as anniversary parties,

Christmas parties, Halloween parties, or bachelor parties.

15.     Plaintiffs then offered the testimony of Mr. Antico, a co-principal and manager of

Cheerleaders II, to, amongst other things, clarify Mr. Meehan's testimony regarding food service.

According to Mr. Antico, Cheerleaders stopped making food, but it never stopped serving it.

Apparently, Cheerleaders has a relationship with a local Gloucester City restaurant known as

Troxies whereby patrons at Cheerleaders can order food from Troxies' menu, Troxies will deliver

the food to Cheerleaders, and the customer may consume it at Cheerleaders.  This happens

8

roughly ten times a day.  For special events, Cheerleaders uses a catering company and provides more substantial food such as shrimp and steak.

16.     Plaintiffs offered evidence that, in 2001, an incident occurred at the Property during which an intoxicated patron got into a physical altercation with another patron, was removed from the premises, and got into a serious motor vehicle accident after driving the wrong way down a street. The ABC pursued regulatory action against Cheerleaders.  The parties contemplated a compromise whereby Cheerleaders could retain its liquor license by paying a substantial fine and perhaps being subjected to a suspension.  Cheerleaders made a business decision that it was too costly to maintain the license and has since voluntarily surrendered it.

17.     Cheerleaders intends to allow patrons to bring their own wine and beer (not hard liquor) to the Property.  Cheerleaders' employees will serve these alcoholic beverages to the customers upon request.  Cheerleaders has indicated that they may decide to convert to all nude or semi-nude dancing at some point in the future, but counsel for Cheerleaders assured the Board that Plaintiffs would need to return to the Board (or court) for permission to do so.  Cheerleaders agreed at the hearing that no customers under the age of twenty-one would be permitted access to the Property.

### C.     Land in Gloucester City

18.     Only two areas in Gloucester City are more than 1,000 feet from residential zoning districts, residential uses, churches, schools, parks, and establishments that serve alcohol on the premises.  (Pls.' Ex. 44.)  These areas are located in the Southwest and Northwest corners of the City.  (Pls.' Exs. 44, 46.)  At the close of evidence, only the Northwest area was more than 1,000 feet from these uses as the Southwest area was zoned for residential use.  Subsequently, Gloucester City passed Ordinance 013-2010, prohibiting residential uses in Southport.

9

19.     The area in the Northwest contains parts of two different zoning districts, Port Cargo

Handling (on the west side of Route 551) and Light Industrial (on the east side of Route 551).

(Pls.' Ex. 44.)  The area is chemically contaminated, (Pls.' Ex. 45), and contains a site listed on

the New Jersey Department of Environmental Protection ("NJDEP") Known Contaminated Sites

List, (Pls.' Ex. 44.  At least part of it is fenced-in and posted with no trespassing signs.  In part, it

is used as a storage area for wood, trailers, and equipment, including unused cargo cranes.  The

water main stops just short of the area and therefore water may not be accessible.  It sits directly

across the street from a marine terminal, which is regarded as a sensitive area for homeland

security concerns and which requires a special ID issued by the Transportation Security

Administration ("TSA") to gain admittance.

20.     The area in the Southwest, known as "Southport," contains part of a Business Industrial

District.  (Pls.' Ex. 46.)  It contains several sites listed on the NJDEP Known Contaminated Sites

List.

## II.     LEGAL CONCLUSIONS

### A.     Jurisdiction

1.     The Court exercises jurisdiction over Plaintiffs' First and Fourteenth Amendment

challenges pursuant to 28 U.S.C. § 1331.

2.     The Court exercises jurisdiction over Plaintiffs' appeal from the decision of the Board

pursuant to 28 U.S.C. § 1367 as interpreted by the Supreme Court in City of Chicago v.

International College of Surgeons, 522 U.S. 156 (1997).

3.     The Court retains jurisdiction despite Plaintiffs' failure to seek a variance.  Although there

is no exhaustion requirement for claims brought pursuant to 28 U.S.C. § 1983, see Patsy v.

Florida Bd. of Regents, 457 U.S. 496, 516 (1982), administrative action must be final before it

becomes judicially reviewable, see Taylor Inv., Ltd. v. Upper Darby Twp., 983 F.2d 1285, 1291

n.10 (3d Cir. 1993).  It is therefore well settled that, "in cases involving land-use decisions, a

property owner does not have a ripe, constitutional claim until the zoning authorities have had 'an

opportunity to arrive at a final, definitive position regarding how [they] will apply the regulations

at issue to the particular land in question.'"  Sameric Corp. of Del., Inc. v. City of Phila., 142 F.3d

582, 597 (3d Cir. 1998) (quoting Taylor Inv., Ld., 983 F.2d at 1291).  Cautioning that courts

should be reluctant to become "super land-use boards of appeals," see id. at 598, the Third Circuit

has required property owners to avail themselves of available, subsequent administrative

procedures as a prerequisite to judicial review in a variety of legal contexts, see, e.g., id.; Acierno

v. Mitchell, 6 F.3d 970, 974-75 (3d Cir. 1993); Taylor Inv., Ltd., 983 F.2d at 1289.

　　　　Pursuant to authority delegated by N.J. Stat. Ann. § 40:55D-70(b), the Board decided that

Plaintiffs were no longer a pre-existing, non-conforming use, and apparently, Gloucester City

notified Plaintiffs that the City intended to shut down their operations.  Other than filing a lawsuit,

Plaintiffs' only option at that point would have been to apply to the Board for a variance to either

permit the unauthorized use or to authorize an expansion of the non-conforming use.  See id. §

40:55D-70(d); N.J. Stat. Ann. § 40:55D-25 (outlining powers of zoning planning board).  The

Board's inquiry would have been whether there were "special reasons" for granting the variance,

whether it could be granted "without substantial detriment to the public good," and whether the

variance would  "substantially impair the intent and the purpose of the zone plan and zoning

ordinance," not whether Plaintiffs' present use was substantially similar to its prior use.  See N.J.

Stat. Ann. § 40:55D-70 (flush language).  In other words, the Board's denial of Plaintiffs'

application was final in the sense that the Board would not have revisited the issue of Plaintiffs'

entitlement to pre-existing, non-conforming use status at a subsequent variance hearing.  Given

Gloucester City's apparent eagerness to enforce the Board's decision and the potential chilling

effect of such a decision on Plaintiffs' constitutionally protected expression, it may well be that

the Board's decision satisfied the ordinary strictures of the ripeness inquiry.  See Williamson

Planning Comm. v. Hamilton Bank, 473 U.S. 172 (1985) (observing that the purpose of the

finality requirement is to ensure that "the initial decisionmaker has arrived at a definitive position

on the issue that inflicts actual, concrete injury").

      In any event, Plaintiffs' claim here that the City has effectively zoned sexually oriented

businesses (at least those without liquor licenses) out of Gloucester City is subject to a less

exacting ripeness standard.  Indeed, ripeness requirements are relaxed for facial First Amendment

challenges because such claims have the potential to vindicate the rights of many would-be

speakers.  Peachlum v. City of York, 333 F.3d 429, 438 (3d Cir. 2003).  Moreover, judicial review

of the Board's decision here will not frustrate in any great measure the policies animating the

ripeness doctrine.  The Board had a full and fair opportunity to find facts and apply the law to

Plaintiffs' application.  In so doing, the Board created a substantial record that aids the Court in its

review.  Moreover, although neither party submitted any evidence on the issue, the Court finds it

unlikely that the Board – having rejected Plaintiffs' original application on the grounds that

Plaintiffs' changed use was basically an intensification of the pre-existing, nonconforming use –

would turn around and find that special circumstances augured in favor of allowing Plaintiffs to

continue to present erotic dancing and that such dancing would not substantially impair the intent

and the purpose of the zone plan and zoning ordinance, which in its current form, clearly disfavors

Plaintiffs' expression.  See Congregation Anshei Roosevelt v. Planning and Zoning Bd. of the

Borough of Roosevelt, No. 07-4109, 2008 WL 4003483, at *11 (D.N.J. Aug. 21, 2008) (mem.)

(citing Murphy v. New Milford Zoning Com'n, 402 F.3d 342, 349 (2d Cir. 2005)) (observing that

a property owner may not be required to pursue a variance if doing so would be futile).

Accordingly, the Court determines that Plaintiffs were not required to apply for a variance before

filing this lawsuit.

### B.    The Decision of the Board

4.    Land use board decisions involving determinations of a pre-existing, non-conforming

status involve mixed questions of fact and law.  See Bonaventure Intern'l Inc. v. Borough of

Spring Lake, 795 A.2d 895, 905 (N.J. Super. Ct. App. Div. 2004) (citing Town of Belleville v.

Parrillo's, Inc., 416 A.2d 388, 392 (N.J. 1980)).  Questions of fact and decisions left to the sound

discretion of the agency will not be overturned unless they are arbitrary, capricious, or

unreasonable.  Berkeley Square Ass'n, Inc. v. Zoning Bd. of Adjustment of City of Trenton, 981

A.2d 127, 132-33 (N.J. Super. Ct. App. Div. 2009).  "A [c]ourt will not substitute its judgement

for that of a board 'even when it is doubtful about the wisdom of the action.'"  Id. (quoting Cell S.

of N.J., Inc. v. Zoning Bd. of Adjustment, W. Windsor Twp., 796 A.2d 247 (N.J. 2002); Kramer

v. Bd. of Adjust., Sea Girt, 212 A.2d 153 (N.J. 1965)).  Boards of adjustment have "peculiar

knowledge of local conditions" and therefore must be allowed a "wide latitude in the exercise of

delegated discretion."  Id. (citing Burbridge v. Governing Body, Twp. of Mine Hill, 568 A.2d 527

(N.J. 1990)).  A court should not disturb a board's decision unless the board has clearly abused its

discretion or acted in a manner inconsistent with the law.  Id. (citations omitted).  On the other

hand, this Court reviews questions of law under the de novo standard.  Toll Bros., Inc. v. Twp. of

13

W. Windsor, 803 A.2d 53, 81 (N.J. 2002) (citing Balsamides v. Protameen Chems., Inc., 734 A.2d

721 (N.J. 1999)); Bonaventure Intern'l, Inc., 795 A.2d at 905.

5.      Pre-existing, non-conforming uses may be continued despite the passage of a zoning

ordinance under which the use is not authorized.  N.J. Stat. Ann. § 40:55D-68.[3]  The purpose of

the non-conforming use exception is "to balance the municipality's interest in being able to amend

its zoning ordinances with the property owner's interest in maintaining the use and value of his or

her property.  Palatine I v. Planning Bd. of Twp. of Montville, 628 A.2d 321, 331 (N.J. 1993),

overruling on other grounds recognized by Toll Bros., Inc. v. Twp. of Moorestown, 2006 WL

2660792, at *8 (N.J. Super. Ct. App. Div. 2006).  The policy of the law is "[t]o restrict, rather

than to increase, nonconforming uses."  Berkeley Square Ass'n, Inc., 982 A.2d at 135; Bove v.

Bd. of Adjustment of Borough of Emerson, 241 A.2d 252, 256 (N.J. Super. Ct. App. Div. 1968)

(citing Betts v. Bd. of Adjustment of Linden, 178 A.2d 209 (N.J. Super. Ct. App. Div. 1962)).

The protections of N.J. Stat. Ann. § 40:55D-68 are strictly applied.  Villari v. Zoning Bd. of

Adjustment of Deptford, 649 A.2d 98, 100 (N.J. Super. Ct. App. Div. 1994); see Town of

Belleville, 416 A.2d at 393 (citing Hay v. Bd. of Adjustment of Borough of Fort Lee, 117 A.2d

650 (N.J. Super. Ct. App. Div. 1955); Heagen v. Borough of Allendale, 127 A.2d 181 (N.J. Super.

Ct. App. Div. 1957); Martin v. Cestone, 110 A.2d 54 (N.J. Super. Ct. App. Div. 1954)) ("[W]here

there is doubt as to whether an enlargement or change is substantial rather than insubstantial, the

courts have consistently declared that it is to be resolved against the enlargement or change.").

6.      Defendants' arguments to the contrary notwithstanding, the Board ruled on Plaintiffs'

---

[3] "Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the structure so occupied . . . ."  N.J. Stat. Ann. § 40:55D-68.

application, and the resolution memorializing its decision is not overly vague or inconsistent. Plaintiffs take issue with the mode of analysis employed by Board, insisting that it should have analyzed each of their three component uses separately and decided whether each was entitled to continuing protection under N.J. Stat. Ann. § 40:55D-68.  According to Plaintiffs, the Board muddled the analysis, on the one hand announcing that its task was to analyze "each use individually and make a determination as to whether these changes affect a non-conforming status of these uses," and on the other hand actually deciding Plaintiffs' application as if it involved only a single, amorphous pre-existing, non-conforming use.

Plaintiffs do not argue that New Jersey law required the Board to analyze the uses separately.  Rather, Plaintiffs' argument is that a use-by-use analytical approach should have been taken to its application because Plaintiffs expressly asked for an interpretation as to three distinct non-conforming uses – uses loosely referred to by Plaintiffs as restaurant, tavern, and go-go.  The Court is not presented with Plaintiffs' written application.[4]  However, a review of the transcript before the Board reveals that Plaintiffs described their own application somewhat amorphously, variously describing the nonconforming use(s) in the singular and the plural.  In fact, at the outset of their presentation, Plaintiffs themselves described their pre-existing, non-conforming use as a singular, multi-faceted use similar to a "nightclub."

By way of analysis, the Board appears to have looked to the three component uses – sale and service of food, sale and service of alcoholic beverages, and provision of adult-oriented

---

[4] According to comments made by Plaintiffs' counsel to the Board, Plaintiffs indicated on its application that the present and existing use of the property was "[g]o-go dancing club, restaurant and tavern" and that the proposed use would be "[g]o-go dancing club, restaurant and tavern."  (Tr. 1/20/2010 at 14.)

dancing entertainment – and asked whether a substantial change had occurred with respect to each.  The Board found that Plaintiffs no longer prepare food at the Property.  MAG Realty, LLC, R05-2010 (Gloucester City Planning Bd. Mar. 16, 2010) (resolution) (hereinafter referred to as "MAG Resolution").  The Board found that Plaintiffs no longer have a liquor license and are therefore no longer subject to the jurisdiction of the ABC.  Id.  The Board found that the times of dancing varied among the witnesses.  Id.  The Board then appears to have considered at least the first two of these findings in light of the substantial similarity standard, concluding that:

> The loss of the liquor license and the fact that food is no longer prepared on the premises is a substantial change from what the previous use was, and that the premises is no longer a bar and restaurant but merely a Go-G[o] establishment without a liquor license and is a new use.

Id.  Whatever else may be said of the Board's analysis, it fairly tracks the way in which Plaintiffs presented their own application.  Moreover, it conveys its factual findings and provides reasons for its legal conclusions.  Accordingly, the Court cannot determine that the Board erred simply by engaging in the aforementioned mode of analysis or by its less than perfect prose.[5]

7.      On the present record, the Court cannot conclude whether the Board's decision was arbitrary, capricious, or unreasonable.  At some points in the Board's analysis, it appears to apply

---

[5]  To the extent Plaintiffs are arguing that the Board should have looked at each of the three component uses and determined that, since Plaintiffs continue each use today, Plaintiffs are ipso facto entitled to protection of N.J. Stat. Ann. § 40:55D-68, Plaintiffs are mistaken as such an approach has been squarely rejected by the New Jersey Supreme Court.  In Town of Belleville, the New Jersey Supreme Court reversed a decision of the Appellate Division that "review[ed] separately each component of the municipality's proofs supporting the contention that defendant's operation was not permitted as a non conforming use" and reasoned that "since each aspect of the 'new' business had been conducted previously, there was no impermissible change from the nature of the 'old' business."  416 A.2d at 390 (citation omitted).  Indeed, the court rejected such a quantitative analysis in favor of a more qualitative analysis that focuses "on the quality, character and intensity of the use, viewed in their totality and with regard to their overall effect on the neighborhood and the zoning plan."  Id.

the appropriate law and reach conclusions within its delegated discretion.  At other points, it appears to apply irrelevant points of law and to reach legally unsupportable results.  Accordingly, the Court will vacate Resolution 05-2010 and remand to the Board for further proceedings consistent with this Opinion.

At the heart of Plaintiffs' motion is their contention that the Board unreasonably determined that their present use of the Property is new.  A pre-existing lawful use is protected from subsequently changed zoning ordinances where the present use is "substantially similar" to the use existing at the adoption of the ordinance making the use unlawful.  Bonaventure Intern., Inc., 795 A.2d at 902.  Generally speaking, a pre-existing, non-conforming use is restricted to its "character and scope" at this time.  Id.  The structure may be maintained and repaired, but "[t]he use may not be enlarged as of right except when the change is negligible or insubstantial."  Id. (citing Palatine I, 628 A.2d at 321); Belleville, 416 A.2d at 388; McDowell, Inc., v. Bd. of Adjustment, 757 A.2d 822 (N.J. Super. Ct. App. Div. 2000)).

As an initial matter, the Board's analysis of the food service aspect of Plaintiffs' business is flawed.  There is undisputed testimony in the record that Plaintiffs prepared and served bar-like food to customers until 2005, around which time Plaintiffs ceased food preparation, though similar food could still be ordered and enjoyed by customers.  The Board explicitly relied on this change to support its conclusion that Plaintiffs' use of the property was not substantially similar to its prior lawful use.  Constrictions of non-conforming uses, however, are favored in New Jersey and do not result in loss of the grandfather protections of N.J. Stat. Ann. § 40:55D-68.  See Arkam Mach & Tool Co. v. Lyndhurst Twp., 180 A.2d 348, 350 (N.J. Super. Ct. App. Div. 1962).  The Board did not discuss Plaintiffs' argument that the changes in the food service aspects of its

17

business constituted a reduction in its non-conforming use.  More importantly, the Court's review

of the record does not reveal any evidence upon which the Board could have relied in determining

that the change from food preparation and service to mere food service constituted anything but a

reduction of the prohibited use.  Accordingly, the Court concludes that the Board either failed to

apply the appropriate legal framework to the undisputed facts or that the Board applied the

appropriate law in a manifestly unreasonable manner.  In either case, reliance on the change in

food service to support a finding of new use was improper on this record.

On the other hand, the Board's alcohol service analysis not wholly flawed.  This is so

despite Plaintiffs' strenuous argument that its BYOB use must be considered a de-intensification

because customers will no longer be able to consume hard liquor at the Property and because

customers may consume less when forced to bring their own.  As a review of the transcripts of the

Board hearings suggest, these are not the only potential consequence of Plaintiffs' change to

BYOB.  The Board observed that without a liquor license, Plaintiffs will no longer be subject to

the regulatory authority of the ABC.  The ABC has a substantial regulatory presence in the

operation of licensed alcohol dispensaries in New Jersey.  It pervasively regulates the conduct of

licensees and their use of the licensed premises.  See, e.g., N.J. Admin. Code. §§ 13:2-23.1 to

13:2-22.33.  It requires licensees to complete various training programs and has the authority to

sanction non-compliance.  See, e.g., N.J. Admin. Code §§ 13:2-22.1 to 13:2-22.9.  It has

substantial investigatory powers and requires acquiescence to its investigations as a continuing

condition of licensure.  See, e.g., N.J. Admin. Code § 13:2-23.30.  Perhaps most importantly, it

has broad disciplinary powers that can be wielded to shut-down non-compliant establishments or

coerce compliance through the threat of same.  See, e.g., N.J. Admin. Code §§ 13:2-19.1 to 13:2-

19.16.  The Board was clearly concerned that Plaintiffs operation as a BYOB would circumvent this otherwise pervasive regulatory scheme and that this would have a potentially deleterious impact on the surrounding community.  It was not unreasonable for the Board to rely on this aspect of Plaintiffs' changed use in determining whether Plaintiffs' current use intensifies the non-conforming aspects of the Property.

That said, some aspects of the Board's substantial similarity analysis are troubling and suggest a fundamental misapprehension of the relevant legal standards.  In point of fact, the Board appears to have adjudged Plaintiffs' current use, at least in part, against current zoning standards as opposed to determining whether Plaintiffs' current use is substantially similar to its use prior to the 1997 enactment of the Development Ordinance.  For example, the Board cited Section 15-6 of the Gloucester City Code, noting that "Ordinance 15-6 provides that in order to have Go-Go dancing, it is necessary to have a consumption license."  MAG Resolution at 3.  Without explanation of its import, the Board also recited the current definitions of "restaurant," tavern/bar," "go-go bar," and "gentlemen's club."  Id. at 2-3.

As a legal matter, it is of no significance to the substantial similarity analysis whether Plaintiffs currently satisfy § 15-6's license requirement or fit within the parameters of defined uses.  In fact, Plaintiffs' very presence before the Board was a concession that they did not so conform.  As noted, the Board's principal inquiry should have been confined to whether Plaintiffs were using the Property in a manner substantially similar to the manner in which Plaintiffs used the Property before it became non-conforming.  The Board's citation to, and recitation of, these definitions, in concert with its finding that it is necessary to have a consumption license to operate a go-go dancing facility, suggest that the Board's decision may have rested, at least in part, on an

19

arbitrary and therefore unreasonable basis.[6]

In sum, the record is insufficient to determine whether the Board's decision was arbitrary, capricious, or unreasonable as a matter of law. Some of the analysis the Board conducted is sound, but some of it is either flawed or inherently suspect. It is impossible to determine whether the Board would have reached the same result had it omitted the improper analysis. Consequently, the Court will vacate Resolution R-05-2010 and remand the matter to the Board for further proceedings consistent with this Opinion. On remand, the Board may consider the fact that Plaintiffs are no longer licensed to serve alcohol in its analysis of whether Plaintiffs' present non-conforming use is substantially similar to its previous conforming use as far as this fact qualitatively affects the nature, character, and scope of Plaintiffs' use and its effects on the surrounding community. The Board should not ask whether Plaintiffs satisfy the current zoning regulations as these regulations are not relevant to the question of whether Plaintiffs' use of the Property now is substantially similar to its use of the Property then. Finally, without more, the Board may not rely on Plaintiffs' change from food preparation and service to mere food service as a basis to conclude that Plaintiffs' use is not substantially similar. As noted, the reduction of prohibited uses is encouraged by the law and may not be held against the owner.

### B.     First Amendment

8.     The parties do not dispute that erotic dancing of the sort currently presented by Cheerleaders is protected expression under the First Amendment. Indeed, nude dancing is

---

[6] The Court assumes that any alleged change in Plaintiffs' go-go use played no part in the Board's decision. Although the Board found that "the times of dancing varied among the witnesses," the Board did not explicitly find that the go-go dancing use had changed or cite to any change in go-go as a basis for its decision.

protected expression unless it crosses the line into obscenity.  See Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65-66 (1981); Phillips v. Borough of Keyport, 107 F.3d 164, 172 (3d Cir. 1997).  There are no allegations here that the scantily clad dancing currently conducted by Plaintiffs (or the nude dancing they may wish to present in the future for that matter) is obscene within the meaning of Miller v. California, 413 U.S. 15 (1973).  Accordingly, the Court finds that Cheerleaders' dancing activities are protected by the First Amendment.

9.      Plaintiffs' constitutional challenge will be analyzed under the so-called intermediate scrutiny standard.  Content-based speech regulation is subject to strict scrutiny and passes constitutional muster only if it is demonstrated to "serve a compelling state interest in a manner which involves the least possible burden on expression."  Id. at 172.  Content-neutral regulations, on the other hand, are subject to intermediate scrutiny.  Id.  The regulation of sexually explicit materials is considered content-based if the regulation is "aimed primarily at suppression of First Amendment rights"; whereas, the regulation of sexually explicit materials is considered content-neutral if the regulation's "predominate purpose is the amelioration of socially adverse secondary effects of speech-related activity."  Mitchell v. Comm'n on Adult Ent. Ests. of Del., 10 F.3d 123, 130 (3d Cir. 1993).  In Renton v. Playtime Theatres, Inc., the Supreme Court treated as content-neutral a municipal zoning ordinance that, "by its terms [was] designed to prevent crime, protect the city's retail trade, maintain property values, and generally 'protect and preserv[e] the quality of the [the city's] neighborhoods, commercial districts, and the quality of urban life," not to suppress the expression of unpopular views."  475 U.S. 41, 48 (1986) (citation omitted).

By its own terms, Note 18 of the Development Ordinance appears to be content-neutral as it claims to be aimed predominantly at the suppression of secondary effects, not suppression of

protected speech.  In fact, Note 18 contains the following "Findings of Fact":

> Sexually oriented business[es] have a deleterious affect on both the existing businesses around them and the surrounding residential areas adjacent to them: causing increased crime, especially prostitution; adversely affecting property values; creating an atmosphere which is inimical to the values of a significant segment of the township's population; and encouraging residents and businesses to move elsewhere.  It is further recognized that sexually oriented business, when located in close proximity to each other, contribute to urban blight and downgrade the quality of life in the adjacent areas.

Gloucester City, N.J., Development Ordinance, Art. V, Note 18.  By its own terms, the purpose and objectives of Note 18 are:

> [T]o minimize and control the adverse effects [noted above] and to promote the public health, safety and general welfare of the citizens of the township.  It is not the purpose of this section to restrict or deny access by adults to sexually oriented materials protected by the First Amendment, nor will this chapter have the effect of restricting or denying such access.

Id.  "In establishing its intent to address the secondary effects . . . a city may rely upon studies and evidence 'generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.'"  Franklin Jefferson, Ltd. v. City of Columbus, 211 F. Supp. 2d 954, 959 (S.D. Ohio 2002) (quoting Renton, 475 U.S. at 51-52).

Plaintiffs here do not contest the Development Ordinances' factual findings or its purpose and objectives.  As a consequence, intermediate scrutiny is the appropriate standard.  Under this standard, Gloucester City must demonstrate that its regulation (1) serves a substantial state interest; (2) is narrowly tailored to further that interest; and (3) leaves adequate alternative channels for the regulated speech.  See Phillips, 107 F.3d at 173.

5.     The Development Ordinance completely zones out Plaintiffs' sexually oriented message.

The Development Ordinance is clear that only those uses explicitly identified as permitted uses in

22

a particular zoning district may locate within that zoning district.  For example, Article 1 of the

Development Ordinance provides:

> On and after the effective date of this ordinance, no land or building shall be used .
> . . for any purpose within Gloucester City except in conformity with the restrictions
> and regulations established by this ordinance for the district in which such land or
> building is located and in conformity with all other pertinent terms and provisions
> of this ordinance.

Gloucester City, N.J., Development Ordinance, Art. I, § 3.  Similarly, Article IV provides:

> In addition to the uses specifically prohibited by this ordinance in Article VIII and
> the schedule referred to herein, no . . . land shall be used . . . nor shall any use of
> land be changed, which said use . . . or alteration of land . . . is intended, in part, for
> any use or purpose, except or in part, for any use or purpose, except the uses
> specifically allowed for in each district of the schedule of district regulations.

Id. at Art. IV, § 1(B).  This point is further made in Art. VIII, which provides, in pertinent part:

> [N]o land shall be used for any purpose other than those included among the uses
> listed as permitted uses in each zone by this Ordinance and meeting the
> requirements set forth by the schedule appended to this Ordinance in accordance
> with Article III.

Id. at Art. VIII, § A-1.  None of the districts defined by the Development Ordinance explicitly

provide for sexually oriented uses.  It might reasonably be said, then, that the Development

Ordinance does not allow sexually oriented businesses to locate anywhere in Gloucester City.[7]

Nonetheless, Defendants take the bold position that sexually oriented businesses may

locate in all zoning districts, provided the businesses satisfy the buffer-zone requirements of Note

18.  This position is predicated on the theory of the City's Planner, Larry Waetzman, that Article

IV, § 2 renders a use provided for in the Notes allowable in all zoning districts, subject to any

---

[7] Although not conclusive, this notion is confirmed by the fact that the Development
Ordinance specifically prohibits in all districts "adult bookstores and related establishments."
Gloucester City, N.J., Development Ordinance, Art. VIII, § B-2.

23

limitations articulated in the Notes.  Article IV provides, in pertinent part:

> The omission of any use or type of use from the Schedule of District Regulations
> shall be deemed an exclusion thereof from all districts, unless said use or type of
> use is included in Article VI of this ordinance entitled, "NOTES."  The notes
> contained in Article VI of this ordinance shall be deemed to be appended to the
> Schedule of District Regulations and are adopted as part thereof and referred to
> therein.

Id. at Art. IV, § 2.  Given that Note 18 deals with sexually oriented businesses, an initial reading

of Article IV, § 2 does not render Defendants' theory implausible.

Upon closer inspection, however, Defendants' position falls apart.  The Notes address

twenty-three subject areas.[8]  Although Note 18 does not, some notes explicitly indicate those

districts in which the subject-matter use of the note is allowed.  For example, Notes 7, 8, and 23

authorize automobile service stations and repair garages, automobile sales and service

establishments, and tattoo parlors to locate in the Highway Commercial District, provided

minimal requirements are met.  If Defendants' theory were accurate, these explicit authorizations

would be superfluous.  Moreover, Defendants' approach would also lead to the somewhat absurd

result that, although historically disfavored uses (like tattoo parlors) would be allowed to locate in

all districts, such uses would be subject to greater restrictions in the less historically protected

---

[8]  The Notes are variously entitled: (1) Buffer Landscaping Requirements; (2) Drive In
Banks; (3) Fences, Walls and Hedges, Subject to the Following Maximum Height Requirements;
(4) Hunter Street Overlay District; (5) Landscape Standards; (6) Medical Complex, Nursing
Home or Convalescent Center; (7) Motor Vehicle Service Stations and Repair Garages; (8) New
and Used Motor Vehicle Sales and Service Establishments; (9) Parking Design Criteria, Off
Street Parking Schedule, Loading Space Schedule; (10) Places of Worship; (11) Port Planned
Industrial Development District; (12) Port Cargo Handling Zone; (13) Private Swimming Pools;
(14) Professional Offices For One Professional; (15) Public Utility Installations and Public
Service Infrastructure; (16) Riverfront Recreation District; (17) Satellite Dish Antennas; (18)
Sexually Oriented Businesses; (19) Schools; (20) Sign Controls; (21) Tree Preservation
Techniques; (22) Fast Food and Drive Thru Restaurants; and (23) Tattoo, Body Art & Body
Piercing Facilities or Parlors.

highway commercial areas than in the more historically protected residential areas.

In addition, although the drafters of the Development Ordinance apparently knew how to expressly authorize uses in all districts, the drafters did not expressly do so with respect to sexually oriented businesses.  For example, Note 15 provides that: "Public utility installations, excluding storage yards and commercial office space, may be permitted in <u>any zoning district</u>," provided certain conditions are met.  <u>Id.</u> at Art. V., Note 15 (emphasis added).  Similarly, with respect to satellite dishes, the Development Ordinance provides that the purpose of Note 17 is "to establish guidelines governing the placement of satellite dish antennas as an accessory use in <u>all zoning districts</u> of Gloucester City.  <u>Id.</u> at Note 17 (emphasis added).  Finally, the Development Ordinance provides that "[n]otwithstanding any other provision contained in this ordinance, schools whether public, private, or trade shall be permitted in <u>all districts</u>."  <u>Id.</u> at Note 19 (emphasis added).  The drafters' failure to use similar language in Note 18 with respect to sexually oriented businesses indicates that they did not intend to authorize sexually oriented businesses in all districts.

Defendants concede (and the Court agrees) that the Development Ordinance is not a masterpiece of statutory drafting.  Nonetheless, Defendants argue that the Court should interpret it in such a way as to avoid unconstitutional results – in other words – in accordance with the Waetzman "every district" theory.  If the Waetzman theory represented a reasonable interpretation of the Zoning Ordinance, the Court would, under well-established rules of statutory construction, be hard-pressed to interpret it otherwise.  <u>See, e.g.</u>, <u>I.N.S. v. St. Cyr</u>, 533 U.S. 289, 299 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' [courts] are

obligated to construe the statute to avoid such problems."); United States v. Jim Fuey Moy, 241 U.S. 394, 401 (1916) (same).  However, for the reasons expressed above, the Waetzman theory is not a reasonable interpretation of the Development Ordinance.  The rule of statutory construction cited by Defendants does not require the Court to read provisions into an ordinance that cannot be said to reasonably exist.

Defendants further argue that the Zoning Ordinance is in para materia with and/or subject to the preemption of N.J. Stat. Ann. § 2C:34-7.  That statute provides, in pertinent part:

> Except as provided in a municipal zoning ordinance adopted pursuant to [N.J. Stat. Ann. 2C:34-2], no person shall operate a sexually oriented business within 1,000 feet of any existing sexually oriented business, or any church, synagogue, temple, or other place of public worship, or any elementary or secondary school or any school bus stop, or any municipal or county playground or place of public resort and recreation, or any hospital or any child care center, or within 1,000 feet of any area zoned for residential use.

N.J. Stat. Ann. § 2C:34-7.  The Court is not persuaded that it should interpret the Development Ordinance as providing for nothing more than the 1,000 foot buffers provided for by the state statute.  Unlike the Development Code, N.J. Stat. Ann. § 2C:34-7 is not a zoning ordinance.  See Do-Wop Corp. v. City of Rahway, 773 A.2d 706, 710 (N.J. 2001) (citing Township of Saddle Brook v. A.B. Family Center, Inc., 722 A.2d 530 (1999)).  It does not prescribe where uses may or may not locate.  That function is meant to be served by the municipal zoning ordinances contemplated by N.J. Stat. Ann. § 2C:34-7.  If Gloucester City wanted to implement nothing more than the 1,000 foot buffer zones created by state statute, all it had to do was expressly permit sexually oriented businesses in all districts.  Moreover, the state statute does not preempt the Development Ordinance as N.J. Stat. Ann. § 2C:34-7 expressly contemplates and yields to municipal zoning ordinances.  See Township of Saddle Brook v. A.B. Family Center, Inc., 722

26

A.2d 530 (N.J. 1999) ("[T]he state statute expressly authorizes municipalities, at their option, to override the statutory limitation by a local zoning ordinance more permissive than the state statute.").   Even if it did preempt, <u>A.B. Family Center, Inc.</u> did not hold that N.J. Stat. Ann. § 2C:34-7 could never produce unconstitutional results.

Though not without its flaws, Plaintiffs' interpretation – that sexually oriented businesses may locate in any district zoned for the underlying use,[9] subject to the buffer requirements of Note 18 – is the more reasonable interpretation.  Although Note 18 neither indicates that sexually oriented businesses may locate in all districts nor indicates the specific districts in which sexually oriented businesses may locate, it does provide that "[s]exually oriented businesses shall conform to the location and development requirements established in the Gloucester City Development Ordinance . . . ."  Gloucester City, N.J., Development Ordinance Art. V, Note 18.  This language is consistent with the notion that sexually oriented businesses are only authorized in those districts in which the underlying use is authorized, subject to the buffer zones created by Note 18.  This interpretation of the Development Ordinance is also consistent with Mr. Waetzman's testimony that to determine a sexually oriented businesses' parking requirements, one should look to the parking requirements articulated at Note 9 for the underlying use.  In fact, this is what Mr. Waetzman himself originally understood the Development Ordinance to mean, at least before he reconsidered his position.

The parties agree that under Plaintiffs' underlying use theory, Plaintiffs may not dance in Gloucester City.  As of the close of evidence, the only area beyond the 1,000 foot buffer zones

---

[9]  By Plaintiffs' definition, an "underlying use" in this context refers to the non-adult aspects of a given use.  For example, the underlying use of an adult bookstore would be a bookstore.

was a small parcel of land in the Northwest corner of the City zoned port cargo handling and light industrial.[10]  Neither district accommodates Plaintiffs' underlying uses (e.g., restaurant, tavern, entertainment, etc.).  See Gloucester City, N.J., Development Ordinance, Art. IV., Art. V., Note 12.  Accordingly, the Court concludes that the Development Ordinance completely zones out Plaintiffs' erotic message.    Application of N.J. Stat. Ann. § 2C:34-7 does not alter this result.  The 1,000 foot buffer zones created by N.J. Stat. Ann. § 2C:34-7 and Note 18 are largely co-extensive.  It appears that under either only the Northwest area is without the buffer zones, and Plaintiffs' underlying uses remain prohibited in this area.

7.      The City has not carried its burden of demonstrating the availability of alternative avenues of expression.  Plaintiffs may not dance in Gloucester City, and Defendants have not proven that localities in the relevant market area provide Plaintiffs the opportunity to do so such that Gloucester City's zone-out might be constitutionally excused.  The New Jersey Supreme Court has endorsed the notion that municipal boundaries are not the be-all, end-all of the alternative avenues analysis.  Rather, courts should consider whether localities within the relevant market

---

[10]    Defendants originally asserted that an area in the Southwestern part of the city, known as Southport, was also outside the buffer zones established by Note 18.  At trial, however, Defendants conceded that Southport was, at the time, zoned residential.  Because sexually oriented businesses cannot locate within 1,000 feet of areas zoned for residential use, Mr. Waetzman testified that Southport was essentially off the table.  Thus, Defendants focused their efforts, such as they were, on demonstrating that the area in the Northwestern part of the City was an adequate alternative avenue.  As a consequence, Defendants did not submit any evidence of the adequacy of Southport.  On July 6, 2010, after the close of evidence, Southport's zoning was changed such that it no longer provides for residential use.  See Ordinance 013-2010.  Defendants therefore argue that the so-called time of decision rule articulated in Kruvant v. Mayor and Council of Cedar Grove Twp., 414 A.2d 9 (N.J. 1980) requires the Court to consider the new Ordinance.  Be this as it may, the record still does not contain evidence that the Southport area is a reasonable alternative avenue for the expression.  Therefore, the mere existence of Ordinance 013-2010 does not carry Defendants' burden of proving the existence of reasonable alternative channels.

area permit the constitutionally protected expression.  A.B. Family Center, Inc., 722 A.2d at 597.
At trial, Defendants adduced evidence as to the existence of numerous sexually oriented
businesses in various nearby New Jersey municipalities as well as in the neighboring City of
Philadelphia.  Defendants did not, however, submit sufficient evidence to establish the relevant
market.  For example, Defendant did not produce any evidence of regional marketing patterns, the
availability of public transportation and access by automobiles, or the geographic distribution of
customers at comparable establishments.  See id. (suggesting that these factors would be relevant
to market analysis).  Moreover, Defendants did not produce expert testimony on this issue.  See
id. (suggesting that expert testimony would ordinarily be required to prove relevant market).

Nonetheless, Defendants attempt to interpose the New Jersey Supreme Court's decision
in DEG, LLC v. Twp. of Fairfield, in place of actual evidence of the relevant market area.  966
A.2d 1036 (2009).  In DEG, the plaintiff retained a planning expert to conduct an analysis of the
alternative avenues of communication.  In his report, the planning expert used a relevant market
area that "encompassed thirty-three municipalities, which when combined, spanned 233.87
square miles and contained 742,306 people."  Id. at 1040.  Plaintiffs argue that, in this case, Mr.
Waetzman located fifty-two sexually oriented businesses in less than half of what was
determined to be the market area in DEG.  This comparison by no means establishes the market
area relevant to this case.  Accordingly, Defendants did not carry their burden of demonstrating
reasonable alternative avenues of expression.

Even under the Waetzman theory – that sexually oriented businesses may locate in all
districts of the City subject to the buffer zones created by Note 18 – Defendants have failed to
prove the existence of alternative avenues of expression.  As noted, as of the close of evidence,

the parties agreed that if sexually oriented businesses were allowed in every district, the 1,000 foot buffer zones established by Note 18 would authorize sexually oriented businesses in only one area of the city; to wit, a roughly ten-acre patch of land on the east side of North Broadway Street in the Northwest corner of the City.  Therefore, Defendants bore the burden of demonstrating that this land provided Plaintiffs with the aforementioned alternative avenue.

To undertake this analysis, courts have, amongst other things, looked to the percentage of accessible land in a given municipality available for the expression.  See City of Renton, 475 U.S. at 53 (suggesting that an ordinance that leaves more than five percent of a municipality's accessible land open to the adult uses provides adequate alternative avenues); Dia v. City of Toledo, 937 F. Supp. 673, 678 (N.D. Ohio 1996).  Of course, the available land need not be "commercially viable" in the sense that it is presently available for sale or lease.  See Renton, 475 U.S. at 53.  Apparently, post-Renton, courts "have generally found the number [of sites] to be inadequate if fewer than a dozen sites, or under 1% of the city acreage, is potentially available."  University Books and Videos, Inc. v. Miami-Dade County, 132 F. Supp. 2d 1008, 1014 (S.D. Fla. 2001) (quoting Dia, 937 F. Supp. at 678) (internal quotation marks omitted).  But see State v. Russo, 745 A.2d 540, 545 (N.J. Super. Ct. App. Div. 2000) (ordinance leaving some portion of 32.1 acres (0.52% of total land area of township) available for sexually oriented businesses does not unduly restrict expressive rights where four such businesses already operated in township).

Defendants did little to carry this burden.  Plaintiffs assert that ten acres represents only 0.7 % of the total acreage of Gloucester City.  Moreover, Plaintiffs submitted evidence that the number of acres actually available for commercial development in the Northwest parcel is

actually significantly less than the ten acres identified by Mr. Waetzman.  For example, Plaintiffs showed that Mr. Waetzman did not consider what appears to be two residences on North Broadway Street, North of the Walt Whitman Bridge in his buffer zone analysis.  Plaintiffs also showed that Mr. Waetzman did not take account of riparian buffers.  Plaintiffs insist that had Mr. Waetzman taken these items into account, the ten acres would be significantly reduced.

In any event, Plaintiffs submitted evidence, which the Court credits and accepts, that the Northwest parcel area is contaminated, that it is fenced and posted with no trespassing signs, that it is used in part as a storage area for wood, trailers, and equipment, including unused cargo cranes, that the water main stops just short of the area and that therefore water may not be accessible; and that it sits directly across the street from a marine terminal, which is regarded as a sensitive area for homeland security concerns and requires a special ID, known as a Transportation Worker Identification Credential card issued by the Transportation Security Administration, in order to gain admittance.  Mr. McLaughlin testified that the lot is not suitable for any generic commercial business use.  As a businessman, Mr. Antico testified to the same.  Accordingly, the Court concludes that the small area of land in the Northwest area of the City is not a reasonable alternative forum for Plaintiffs' expression.

This result also obtains under N.J. Stat. Ann. § 2C:34-7.  Although largely co-extensive, the buffer zone created by operation of N.J. Stat. Ann. § 2C:34-7 is actually slightly smaller, in at least one respect, than the buffer zone created by Note 18.  This is so because Note 18 protects residential uses; whereas, N.J. Stat. Ann § 2C:34-7 only protects areas zoned for residential uses.  Assuming Mr. Waetzman's theory and applying N.J. Stat. Ann. § 2C:34-7 to Gloucester City yields slightly more area in the Northwest corner of the City available, from a geometrical

perspective, for Plaintiffs' erotic use.  Nonetheless, Defendants did not put on evidence to carry their burden of showing that this area provided an alternative avenue for the expression.   In sum, under either party's construction of the Development Ordinance, Defendants have failed to show that there is anywhere in Gloucester City that Plaintiffs can lawfully dance.

8.     The Development Ordinance's regulation of sexually oriented businesses is too vague to withstand First Amendment scrutiny.  This conclusion should come as no surprise to the parties as all agree that the Development Ordinance is Byzantine.  Gloucester City has forwarded an interpretation that is patently unreasonable.  Plaintiffs have offered a plausible interpretation, but as the Court noted, even this interpretation is not without its flaws.  A regulation is void for vagueness if it fails to provide notice sufficient to enable ordinary citizens to understand the conduct that it prohibits or if it authorizes and encourages arbitrary and discriminatory enforcement.  City of Chicago v. Morales, 527 U.S. 41, 56 (1999).  An ordinary citizen who wants to express a constitutionally protected message through exotic dance in Gloucester City simply cannot look at the Development Ordinance and understand where he or she may set up shop.  This utter indecipherability lends itself to arbitrary enforcement.  Thus, the Court concludes that the Development Ordinance's treatment of sexually oriented businesses is void for vagueness under the First Amendment.

9.     Federal Rule of Civil Procedure 5.1 does not require the Court to refrain from rendering a decision on Plaintiffs' challenges.  Defendants urge the Court to reach a contrary result by arguing that Plaintiffs and the Court have not complied with the requirements of Rule 5.1.  That rule requires a party challenging the constitutionality of a state statute to promptly file notice with the state attorney general if the state is not a party to the action and to serve the notice and the

papers raising the issue with same.  Fed. R. Civ. P. 5.1(a)(1)(B).  Rule 5.1 also requires the Court

to certify to the state attorney general that a statute has been questioned pursuant to 28 U.S.C. §

2403.  Fed. R. Civ. P. 5.1(b).  This procedure affords the attorney general an opportunity to

decide whether her intervention is in the public interest.  Fed. R. Civ. P. 5.1(c).

On February 25, 2010, Plaintiffs filed a notice on the docket in this case pursuant to Rule

5.1 and certified that the New Jersey Attorney General had been notified.  In a subsequent letter,

counsel for Gloucester City appears to concede that he may have overlooked this filing.

Plaintiffs are correct, however, that the Court did not also provide the Attorney General with a

certification.  Nonetheless, the Court does not believe that this omission prevents entry of

judgment in this case because the policies underlying Rule 5.1 have in no way been

circumvented.[11]  The Attorney General of New Jersey is on notice of the constitutional questions

at issue in this action, including Plaintiffs' challenge to N.J. Stat. Ann. § 2C:34-7, if applicable.

Although the Court was also required to certify the constitutional question, this certification

would be entirely redundant here.  See 4B Charles Alan Wright, Arthur R. Miller & Mary Kay

Kane, Federal Practice and Procedure § 1154 (3d ed. 1998, 2010 Supp.) (observing that a court's

certification remains important where constitutional issue is raised outside the pleadings, written

motion, or other papers as it is the only notice to attorney general); Fed. R. Civ. P. 5.1 Adv.

Comm. Note (same).  For whatever reason, the New Jersey Attorney General has not chosen to

intervene in this case.  Perhaps this is so because – notwithstanding Plaintiffs' less than full

throated challenge to the state statute – the Attorney General views this case as the parties have

---

[11]  The Court does not suggest that courts may simply ignore the requirements of Rule 5.1 and 28 U.S.C. § 2403 if and when they feel that compliance would be superfluous, only that the Court's inadvertent omission in this case does not warrant further delay.

litigated it, namely as a challenge directed primarily towards Gloucester City's threatened application of its Byzantine land use regime to Plaintiffs' constitutionally protected dancing.[12]

10.     The Court will permanently enjoin Defendants from enforcing the Gloucester City Development Ordinance, the location requirements of Chapter 12 of the Gloucester City Code, as well as N.J. Stat. Ann. § 2C:34-7 against Plaintiffs.  A plaintiff requesting a permanent injunction must show (1) an irreparable injury; (2) the inadequacy of legal remedies; (3) that an equitable remedy is warranted given the balance of hardships between the parties; and (4) that the pubic interest would not be disserved by the injunction.  eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 390 (2006); see Gucci v. Am., Inc. v. Daffy's Inc., 354 F.3d 228, 236-37 (3d Cir. 2003).

        In this case, Plaintiffs have shown that they stand to suffer an irreparable injury that could not be redressed at law.  Loss of free speech rights constitutes irreparable injury.  See Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.").  In this case, the enforcement of the Development Ordinance and Gloucester City Code § 12-4 against Plaintiffs would render Plaintiffs unable to engage in protected expression in Gloucester City.  Therefore, the injury Cheerleaders would suffer by virtue of enforcement would be irreparable.  Although a monetary award is typically sufficient to redress the injury incident to a loss of business operations, a monetary award would not compensate Plaintiffs for the unconstitutional muzzling and

---

        [12]  Even if the Court were to look more favorably on Defendants' Rule 5.1 argument, it would only work to delay the inevitable, seeing as how the Court's omission does not cause Plaintiffs to forfeit an otherwise timely asserted constitutional claim.  Fed. R. Civ. P. 5.1(d).

consequent loss of expressive outlet contemplated by Gloucester City.

Plaintiffs have also shown that both the private and public equities cut strongly in favor of granting the permanent injunction.  As a consequence of the Court's order (and as a precondition to eventually vacating the permanent injunction), Gloucester City will have to rewrite its Development Ordinance to provide an avenue of expression for constitutionally protected erotic dancing.  Moreover, Gloucester City will have to do so in a way that is understandable and does not lend itself to arbitrary enforcement.  There is no doubt that this will work somewhat of a hardship on the City given that it assuredly has other pressing matter that require its attention.  On balance, however, the hardship of providing its citizens with an understandable zoning ordinance that comports with the Constitution pales in comparison to the hardship that would be worked on Plaintiffs without the injunction.  As noted, that hardship would be the utter inability to convey constitutionally protected messages within the limits of Gloucester City.  Finally, requiring Gloucester City to abide by the Constitution does not disserve the public interest.  Although many members of the public assuredly do not approve of Plaintiffs' erotic message, the public nonetheless has an overwhelming interest in protecting speech notwithstanding its unpopularity.  That judgment, at least as a general matter, was made long ago, and it applies with full force here where a municipality has completely zoned out a constitutionally protected message.

11.    Accordingly, judgment will be entered as follows:

a.    Gloucester City will be ordered to amend its Development Ordinance within a reasonable time to provide an adequate avenue for Plaintiffs' constitutionally protected expression, in conformity with Renton and its progeny, that is written in such a way as to provide

notice to citizens of where they may locate within Gloucester City to convey sexually oriented expression.

      b.     A permanent injunction will enter against Defendants, prohibiting Defendants from the following:

           1.     Enforcing any provision of the Gloucester City Development Ordinance against Plaintiffs as a consequence of presenting constitutionally protected adult dancing;

           2.     Enforcing §12-4 of the Gloucester City Code against Plaintiffs; and

           3.     Enforcing N.J. Stat. Ann. § 2C:34-7 against Plaintiffs.

The aforementioned injunction will not vacate until such a time as Defendants return to Court with an amended land use regime that complies with the Constitution.

      c.     The Court will vacate the Board's decision memorialized at Resolution R-05-2010 and remand the question of Plaintiffs' right to operate their business at the Property pursuant to N.J. Stat. Ann. § 40:55D-68 for further proceedings consistent with this Opinion.

Dated: 8-12-2010                         /s/ Robert B. Kugler
                                        ROBERT B. KUGLER
                                        United States District Judge